## 2252. CABANISS v. THE STATE.

1. Prima facie, a person charged with a misdemeanor suffers no prejudice from having his case tried as if it were a felony, provided the court sentences him as for a misdemeanor.

2. The offense of a president or director of a bank declaring a dividend from funds of the bank, other than the legitimate profits, is a several rather than a joint offense; and in an indictment against the president or one of the directors it is not necessary to set out the names of other directors not indicted, though they may have participated in the declaration of the dividend.

3. It is criminal for the president and directors of a bank to declare a dividend from funds other than profits, whether the bank in question be a bank of issue or not.

4. The alleged disqualification of grand jurors propter affectum is not valid ground for plea in abatement to an indictment.

5. The fact that there is another indictment pending in court against the defendant, charging him with the same offense, affords no ground for plea in abatement.

6. It is no ground for quashing an indictment that the oath was administered to the regular grand jurors, who served during the term, by a judge of the superior court who happened to be disqualified from trying the case arising on the particular indictment.

7. The evidence shows, practically without dispute, that during the defendant's incumbency as president of a bank, the bank suffered losses through taking papers that proved to be insolvent and worthless; that these bad debts and worthless papers were not charged off, but were allowed to accumulate until they were sufficient not only to offset all surplus and undivided profits, but also seriously to impair the original capital of the institution, and that while this state of affairs existed, and at a time when the defendant in all human probability knew it existed, he joined with the board of directors in declaring a dividend. *Held*, that, irrespective of the defendant's motives in the matter, the transaction was a violation of the penal statutes of this State; and that these main facts are so strongly established as to preclude the granting of a new trial for slight errors in the admission or rejection of testimony relating to collateral issues.

8. It is not sufficient ground for new trial that the court caused a disqualified juror to be put upon the defendant, where it appears that the juror was stricken; especially where it does not appear that the defendant was thereby caused to exhaust his peremptory challenges.

9. In a criminal case it is ground of challenge that a juror is over 60 years of age. If the fact is known in advance, the right of challenge is waived by his being accepted as a juror. But if the fact of his being over age is discovered after he has gone into the box, but before the State has begun the introduction of testimony, either party may call the attention of the court to the matter, and it thereupon becomes the duty of the court to cause him to be removed from the jury.

10. In the prosecution of a bank president for illegally declaring a dividend on a given date, evidence going to show that the conditions which made

the declaration of the dividend illegal had existed for some time prior thereto is relevant, as tending to establish the condition of the bank's affairs on the day in question, as well as to show the president's opportunities for knowledge of these conditions. Proof of the fact that, while this condition of affairs was in existence, prior dividends had been declared is relevant, as showing that the profits of the bank, instead of having been used to restore the bank to such a condition as would justify the declaration of a dividend, had been distributed to the stockholders.

11. Though the charter and by-laws of a bank may be the highest evidence as to who should control its affairs, yet it is competent for a witness to testify that a designated person in fact controlled it,—that is, had personal charge and direction of its business and affairs.

12. Whether a party shall be allowed to ask a witness a leading question is a matter addressed solely to the discretion of the trial judge.

13. Where only the existence or identification of documentary evidence is involved, or where the contents of the writing are not the thing material to the inquiry, it is permissible for a witness to refer to the papers in question and to describe them in a general way.

14. Where facts can be ascertained only by an examination of a large number of details on books of account, it is permissible for an expert accountant, who has made an examination of the books and figures, to testify as a witness and to give a summarized statement of what the books show, provided the books themselves are made accessible to the court and to the parties. Moreover, any error in the admission of evidence of this kind is cured where the books themselves are introduced in evidence and it is admitted that they show the same facts testified to by the witness.

15. Though the court may have been guilty of abstract error in refusing to allow the defendant's counsel to ask the State's witnesses, especially the expert accountants, as to how long it would have taken the defendant to ascertain the bank's condition by an examination of the bank's books, still, under all the facts of the case, the error was immaterial and not of sufficient importance to justify the granting of a new trial.

16. There was no error in allowing one witness to testify as to the correctness of a list of insolvent papers carried among the bank's assets (though he was ignorant of the fact of the solvency or insolvency of the papers), and in allowing another witness, who could not swear to the correctness of the list, to testify as to the solvency or insolvency of the particular papers mentioned. The testimony thus connected was admissible.

17. Solvency or insolvency is a matter admitting of opinion evidence, under the general rules on that subject.

18. There was no error in admitting in evidence the correspondence referred to in the 18th division of the opinion.

19. There was no error in admitting in evidence the books of the bank.

20. Colloquies between court and counsel as to the validity of objections to evidence do not usually afford cause for new trial. The incident complained of in the present case, as explained by the trial judge, falls within the general rule.

21. The testimony as to the transactions had with the bank by an alleged

partnership was admissible in connection with other testimony, which, while disputed, tended to show that the defendant was a member of that partnership.

22. The action of the trial judge in overruling defendant's motion for a continuance, in the light of all the circumstances, does not warrant the grant of a new trial by this court.

23. Even if it be valid ground for plea in abatement to an indictment that a qualified grand juror was discharged from the body, the fact that he was not for some cause disqualified or otherwise entitled to be relieved from service must affirmatively appear. Especially is this true where eighteen qualified grand jurors remained after the juror in question had been excused.

24. No sufficient cause for the granting of a new trial appears.

DECIDED JUNE 14, 1910. REHEARING DENIED SEPTEMBER 6, 1910.

Indictment for declaring unlawful dividend; from Bibb superior court—Judge Whipple.    September 23, 1909.

*J. H. Hall, W. D. Nottingham, Roland Ellis, M. Felton Hatcher, Warren Roberts, Custis Nottingham, Henry C. Peeples,* for plaintiff in error.

*Walter J. Grace, solicitor-general, T. S. Felder,* contra.

POWELL, J.    It will be necessary to extend this opinion to an unusual length, in order to cover the case as presented in this court.    The record contains about 400 pages of typewritten matter. Nevertheless, we will attempt to deal with the case as briefly as is possible with due regard to the number of points presented and their importance.    The indictment (omitting the formal parts) charges: "On the thirty-first day of December in the year nineteen hundred and six, in the county aforesaid, [the defendant] did then and there unlawfully, being president of the Exchange Bank of Macon and a director of said bank and a member of the board of directors thereof, said bank being a banking corporation existing under and by virtue of the laws of the State of Georgia and having its principal office and place of business located in the city of Macon in said county, declare, in connection and conjunction with the board of directors of said Exchange Bank of Macon and a majority of said board of directors, a dividend of three per centum upon the capital stock of said Exchange Bank of Macon, and did then and there, in pursuance of said declaration of said dividend of three per centum as aforesaid, pay over said dividend to the stockholders of said Exchange Bank of Macon, said payment of said dividend as aforesaid being then and there made from the capital stock of said Exchange Bank of Macon and from other

funds of said bank and not from the net profits arising from the business of said Exchange Bank of Macon, said declaration of said dividend and said payment thereof not being then and there authorized by the net profits' arising from the business of said corporation. And the grand jurors aforesaid, upon their oaths aforesaid, do further say that the aforesaid offense herein alleged was unknown until the sixth day of July in the year nineteen hundred and seven."

To this indictment the defendant filed a demurrer, presenting in substance the following grounds: that the indictment fails to allege that the Exchange Bank of Macon was a bank of issue; that it does not allege the names of the persons with whom this defendant acted in connection or conjunction, or show that they were unknown to the grand jurors, the offense being one which under the public law of this State could not be committed by one person alone, and therefore being a joint offense; that the indictment fails to allege any offense under the laws of this State. While the demurrer contains other grounds, the above statement practically covers them all.

The defendant filed also a plea in abatement. The first ground sets up that nine of the grand jurors impaneled at the term of the court at which the presentment was returned were not legally qualified to act as grand jurors in the investigation of the case, because they were drawn by Judge W. H. Felton (judge of the superior court of the county in which the prosecution was pending), together with Robert A. Nisbet, clerk of said court, and George W. Robertson, the sheriff; and these persons were disqualified to act in the drawing of the grand jurors by reason of their being depositors in the Exchange Bank, and for other disqualifying causes. The second ground of the plea in abatement sets up that the precept containing the names of the grand jurors objected to was turned over by Judge Felton to Mr. Nisbet, the clerk, and that the latter was disqualified to handle the precept. The third ground sets up that Mr. Robertson, the sheriff, was disqualified to serve the grand jurors. The fourth ground sets up that Judge Felton was disqualified in causing these jurors to be impaneled to act as grand jurors. This ground also contains a subdivision setting up that ten other persons were held to be qualified jurors by Judge Felton, but we are unable to ascertain exactly what is meant by this

objection, as these persons do not appear in the list of grand jurors which is set out in the bill of indictment in the case. The fifth ground of the plea in abatement sets up that one of the grand jurors who participated in the return of the bill of indictment was related within the prohibited degrees to a stockholder in a corporation which was a depositor in the Exchange Bank, and was for that reason disqualified. The sixth ground sets up that one of the grand jurors was a stockholder in the Union Savings Bank & Trust Company, which was a depositor in the Exchange Bank, and for that reason was disqualified. The seventh ground sets up that nine of the grand jurors who participated in the return of the bill of indictment were disqualified to act as grand jurors in the investigation of the case, for the reason that they were drawn after the opening of the term by Judge Whipple, who presided in this case in lieu of Judge Felton, and were drawn by him in connection with Mr. Nisbet, the clerk, and Mr. Robertson, the sheriff, the latter two being disqualified from participating in the drawing of the grand jurors. The eighth and ninth grounds set up the disqualification of Mr. Nisbet, the clerk, to issue summons for the grand jurors, and of Mr. Robertson, the sheriff, to serve the precept. The tenth ground of this plea complains that the grand jurors were not properly purged by Judge Whipple, because none of them were asked as to their relationship to depositors in the Exchange Bank at the time of the failure, and that as a result of his failure to ask this question, two were either depositors or related to depositors served upon the grand jury returning the bill of indictment. The eleventh ground makes substantially the same complaint. If we understand the twelfth ground, the point is that when Judge Whipple purged the original grand jury so as to remove disqualified persons, for the purpose of taking up for consideration the present case, and as a result caused a number of tales jurors to be placed upon the grand jury, he caused the oath to be administered to the tales jurors only, and did not require the remaining members of the body to be resworn. The thirteenth ground complains that one of the grand jurors, after being impaneled, was excused from service improperly, for the alleged reason that no legal cause for his discharge as a grand juror was shown by the minutes of the court or known to the defendant. The fourteenth ground sets up that the present bill of indictment

should be quashed because there was already pending against the defendant in court another special presentment for the same offense. The fifteenth ground sets up that the defendant had not been given sufficient time to investigate or challenge the qualifications of the grand jurors impaneled for the purpose of considering the special presentment against him—the defendant having been given one hour after the impaneling of the grand jurors in which to ascertain whether the grand jurors were qualified or not.

While the special presentment denominated the crime as "a felony," the jury recommended that the defendant be punished as for a misdemeanor, and the judge approved the recommendation and imposed sentence accordingly. After the conviction, the defendant filed a motion for new trial and a motion in arrest of judgment. The grounds of the motion for new trial will not be stated here, but the facts upon which they depend will be discussed in the course of the opinion. The motion in arrest of judgment was based upon substantially the same grounds as those set out in the demurrer and upon the further ground that the law upon which the special presentment was returned had been repealed and was not existing at the time of the alleged offense.

1. Taking up the points in somewhat inverse order, we will consider the question as to whether there was in existence at the time of the alleged offense any criminal statute covering the crime; for if there was no statute covering the transaction, it would be needless to consider the other points presented. Section 210 of the Penal Code provides: "No dividends shall be made by any bank, except from the net profits arising from the business of the corporation; and if any president and directors shall declare, or pay over any dividend from the capital stock, or any other funds of the bank, except the net profits thereof, such president and directors shall, severally, be punished by confinement and labor in the penitentiary for not less than four years nor longer than ten years." Section 691 of the Penal Code provides: "No joint-stock company, corporation, or other association, shall declare any dividend, or distribute any money among its members as profits, when such dividend, or money, is not the legitimate proceeds of its investments. Any president, director, or other officer or agent of any joint-stock company, corporation, or other association, violating the provisions of this section, shall be guilty of a misdemeanor." The particular

point made by counsel for plaintiff in error is that the statute codified in § 210, supra, was repealed by the enactment of the statute of 1887, codified in § 691, supra; the latter being the last legislative enunciation on the subject, except in so far as § 691 has been amended in an immaterial respect by the act of December 16, 1902 (Acts 1902, p. 58). We recognize the rule that where there are two conflicting sections of the code and both are derived from legislative acts, that section prevails which is derived from the later act, it being considered the last expression from the law-making power on the subject. *Berry* v. *Jordan,* 121 *Ga.* 537 (49 S. E. 607); *Lamar* v. *Allen,* 108 *Ga.* 158, 165 (33 S. E. 958). However, we deem it unnecessary to decide whether § 210 of the Penal Code is still in force, or whether it has been repealed by the act codified in § 691. If § 691 applies to banks, then, so far as the present transaction is concerned, its only effect was to make the crime charged against the defendant a misdemeanor instead of a felony. It would still be unlawful for the president and directors to pay dividends from the capital stock or any other funds of the bank, except its net profits legitimately derived from its investments; and the present indictment would be adequate to charge that offense. The writer may personally express the view that the argument in favor of the proposition that banks are included within the provisions of § 691, supra, is very strong, and that there is much in the history of the legislation on this subject tending to support counsel for the plaintiff in error in their contention that the latter act has operated to repeal the former; but, as we have said, this is immaterial, for the defendant has received a misdemeanor sentence. It does not appear from the record that the defendant was in any wise prejudiced by the fact that the grand jury, in returning their presentment, spoke of the offense in general terms as a felony. The rule is too well recognized to require even the citation of authority that it is immaterial by what language an indictment styles the offense charged, if it in fact charges an offense. Nor is there any complaint that at any time during the progress of the trial the defendant was in any wise prejudiced because the court may have had in mind that he was trying the defendant for a felony. Indeed, so far as the record is concerned, we are not able to say that the court treated the matter as a felony further than to allow the defendant to challenge the jurors as if

he were on trial for a felony; and he does not complain of this fact and could not well complain of it. He received a misdemeanor sentence; this is the controlling fact. Practically the same point was involved in *Ayers* v. *State,* 3 *Ga. App.* 305 (59 S. E. 924), and it was held there that "where, by an erroneous conception of court and counsel, a misdemeanor case is tried as if it were a felony, but the error is discovered before sentence, so that no harm in this respect results to the defendant, the error is prima facie harmless to the defendant."

2. The court is of the opinion that the point raised by the demurrer, that the indictment should have set forth the names of the other directors, is not well taken. The indictment is substantially in the language of the statute; and the statute itself (whether § 210 or § 691 be recognized as the proper statute) seems to contemplate that the offense shall be several, rather than joint in such a sense as to require that all who participated should be named in the indictment. We do not think that decisions in riot cases, holding that the other participants must be named, if known, are either applicable or controlling in a case like this.

3. The point that the indictment should have alleged that the · Exchange Bank was a bank of issue is not well taken, irrespective of the question as to whether the indictment was under § 210 or § 691. Certainly such an allegation would not be required under § 691; and following *Youmans* v. *State,* 7 *Ga. App.* 101 (66 S. E. 383), it would not be required under § 210. We find, therefore, no error in overruling the demurrer and the motion in arrest of judgment. The *Thornton* case, 5 *Ga. App.* 397 (63 S. E. 301), did not touch this question.

4. As to the plea in abatement: It was held by this court in *Hall* v. *State,* 7 *Ga. App.* 115 (66 S. E. 390), that "alleged disqualification of grand jurors propter affectum is not a valid ground for plea in abatement to an indictment." Even if this did not fully cover the points made, the well-recognized rule that where the disqualification of the grand jurors is known prior to the return of the indictment, the objection must be made at that time or it will be considered waived, would control. We think, however, that the whole question is decided in the *Hall* case.

5. The plea in abatement contains the ground that there was **another** presentment pending in court against the defendant for

the same offense. It is well settled in this State that in criminal cases a former indictment or former arraignment constitutes no defense, except in cases where there has been former jeopardy. *Gray* v. *State*, 6 *Ga. App.* 428 (65 S. E. 191), and cases cited.

6. The fact that Judge Whipple did not reswear the grand jurors who remained on that body after the disqualified jurors were removed affords no ground for abating the indictment. The grand jurors take the oath severally, even though they be sworn in a body. Even though Judge Felton was disqualified in the case at bar, and though it became necessary for Judge Whipple to reorganize the grand jury to a certain extent, still Judge Felton was not disqualified to administer the oath to the grand jurors who were to serve generally during the term. It would not be reasonable to hold that a judge of the superior court could not perform the usual acts incident to organizing the court if he happened to be disqualified in some case that was likely to come up during the session, or to hold that if, as happened in the present case, it became necessary during the progress of the term to present to the grand jury some matters in which he was disqualified, the grand jurors would be absolved from the oaths which he had previously caused to be administered to them.

7. Coming now to the motion for new trial: As is usual, the first ground is that the verdict is without evidence to support it. The point is not stressed in the argument, but we may take this as a suitable heading for stating certain matters which will, in a greater or less degree, be relevant in the consideration of other points presented in the motion for new trial; for there is no complaint made as to the charge of the court, and the motion for new trial relates largely to rulings upon matters depending upon the evidence.

The proof is overwhelming that at the time the dividend in question was declared, the Exchange Bank was hopelessly insolvent and had been so for some time. It is likewise very clear from the testimony, and practically undisputed, that this bank had been carrying upon its books, as live assets, stocks, notes, and accounts which for a long period of time had been so utterly and hopelessly insolvent as to render them absolutely worthless. These items amounted to at least $240,000. They were sufficient, if they had been charged off, to have consumed not only the undivided profits,

but the surplus fund of the bank, and to have impaired its capital. The testimony of the expert accountant showed that as far back as June 30, 1905, the capital stock of the bank, which was $500,-000, had been impaired nearly $140,000.     But it takes no expert accountant to see that if such items as stock in defunct banks and corporations, old notes, and overdrafts on persons who had been insolvent for a long time—according to the undisputed testimony, hopelessly insolvent—had been written off the books, there would have been no profits from which to declare a dividend.     It is beyond all question that these items far exceeded the sums legitimately earned by the bank's investments during the dividend period immediately in point.

The code sections in question do not contain any express provision relieving a president or director from criminal liability where he declares a dividend in good faith, believing that the bank has earned it, yet it seems to be the correct view that such an exception does exist by implication; but if it exists, there must run with it the corollary that before the offending official can claim the benefit of any such exception, it should appear that he has not acted recklessly—that he has not wilfully or in gross negligence shut his eyes to the situation.

The president of a bank is, of course, charged by law with knowledge of what is contained upon its books, and with a knowledge of the condition of its financial affairs, but in a criminal trial of the character now before us, this is only a prima facie inference, and we can readily see that in a bank of the size of the Exchange Bank of Macon, the president would have to rely for his information, more or less, upon the bookkeeping of his subordinates and upon reports made to him by them.     And if he acted in good faith upon such reports and was really deceived as to the condition of affairs, and if, thus honestly but ignorantly acting upon the belief that the bank had really earned a dividend, he joined in declaring it, it would be hard indeed, if not contrary to law, to hold him criminally responsible for doing what any other reasonably prudent man would have done under the circumstances.     But under the facts of the present case, it is hardly conceivable that the defendant, who, even according to his own statement on the trial, practically controlled the bank, so far as its general management was concerned, who had spent a long number of years in its service

in the respective positions of cashier and president, who himself says, "I usually remained in the bank, engaged in the duties devolving upon the president, from 10 to 12 hours a day, going to the bank about 8 o'clock in the morning, taking only about one hour for dinner, and then remaining at the bank from after dinner until late in the afternoon, and often returning at night;" who was absent from its service during the whole period of his incumbency only once, when he took a ten days' vacation,—it is hardly conceivable that he could have failed to know that the bank was carrying as live assets this large amount of paper which was long since hopelessly dead.  It was not necessary for this defendant, situated as he was, to have had any accurate knowledge of what was contained upon the books of the bank, for him to have known that these dead items should have been charged off before dividends were declared.  We can readily see how the defendant could have excused himself in his own conscience from the painful duty of embarrassing his bank by charging off these dead items.  He doubtless conceived that it would be best in the long run not to make the bank's embarrassment public, as it would have been made through the fact that it had failed to declare a dividend.  But motives of this kind, exculpatory as they are in a certain sense, do not afford any legal excuse for a plain violation of the law.

It is fair to the defendant to state (especially in the light of what we have felt it our duty to say above) that his personal interest in the matter of declaring dividends was somewhat small, for he owned no very great amount of the bank's stock; the dividends for the most part went to others.  We think it is plain that he committed the crime charged against him in an effort to conceal the bank's embarrassments for the purpose of tiding over them, and to shield the directors, stockholders, depositors, and the public from the losses which usually follow when the credit of a big banking institution becomes impaired or questioned in the public mind. For it is a critical thing for a bank's credit to become questioned or for knowledge of its embarrassments to become public—such things are so easily exaggerated in the public mind.  The point is that it is wholly unnecessary to impute to the defendant corrupt or malign motives, in order to say that the record before us shows plainly and practically unequivocally that he violated the law in regard to the dividend in question.  His bare statement to the con-

trary is all that stands opposed to the overwhelming proof; and even in his statement, specific as it is as to many matters, he does not attempt to deny (to any great extent at least) the things which to our minds make his guilt the plainest.

We have said this much as a basis for the proposition that it would take some error of more than minor importance to justify a reversal of the case. The fact of the long and useful life of the defendant, and of the exceeding high character which the proof on both sides of the case shows that he bore, has caused us to hesitate to make the statement which we have just made as to the evidence; for no court should forget that high character and good name are entitled to some consideration, when facts are being placed upon perpetual record; but after all, it is perhaps fairer to him and to the public that the full facts should be known and understood, and that we should plainly state that what he has been convicted for is, that instead of charging off from the bank's assets notoriously bad debts and applying whatever profits there were to restoring the bank's capital, he retained these insolvent items as live assets, and from this basis declared a dividend, when the dividend should not have been declared, though not he, but others, received the chief benefit from his violation of that strict law which governs, and should govern, the officers of banks.

8. The amended motion for new trial originally contained seventy grounds, numbered from 1 to 70 consecutively. Of these, the following were either stricken or withdrawn at the hearing: grounds 17, 18, 19, 21, 23, 26, 34, 35, 42, 44, 46, 49, 51, 53. Grounds 1 and 6 were practically emasculated by explanatory notes of the trial judge. Grounds 8, 30, 66, 55 and 69 are not adequate, on account of formal deficiencies, to present any question for adjudication. Grounds 9, 14½, 24, 25, 37, 39, 40, 45 and 54·may be disposed of with the statement (without going into detail) that the errors complained of were, even if well founded, too slight to justify a reversal, or else were cured by what subsequently took place in the trial, or were rendered harmless by the admissions of the plaintiff in error himself. So these grounds will be eliminated in advance before we proceed to take up for discussion the other matters presented in the motion.

In the second ground of the motion complaint is made that the court refused to put a juror named Cane on the court as trior, on

the ground that he was a depositor at the time of the failure of said Exchange Bank and at the time of the declaring of the dividend in question. It appears, however, that Mr. Cane did not serve upon the jury; and it does not appear that the defendant exhausted his strikes or was caused to exhaust his strikes by reason of challenging him. This exception, as well as the one contained in the fifth ground of the motion on a kindred point, are practically controlled against the plaintiff in error by the decisions in the cases of *Carter* v. *State,* 106 *Ga.* 373 (6), 377 (32 S. E. 345, 71 Am. St. R. 262), and *Cochran* v. *State,* 113 *Ga.* 736 (3), 739 (39 S. E. 337).

9. In the third and fourth grounds exception is taken to the fact that the court, on objection of State's counsel, excluded from the jury a Mr. Long, who had been accepted by both sides of the case, on the ground that he was over 60 years of age. It appears that the juror had been called to the box in ignorance of the fact that he was over 60 years of age. The judge's attention was called to the matter before the jury was sworn, and he ordered the juror to step aside. In § 973 of the Penal Code it is made a cause for challenge that a juror is over 60 years of age. It is further provided in the same section that if the objection "be true in fact, but the fact is unknown to either party, or the counsel for such party, at the time the juror is under investigation, and is subsequently discovered, such objection may be made, and the proof heard at any time before the prosecuting counsel submits to the jury any of his evidence in the case." In the case before us, it appears that State's counsel did not know at the time the juror was first examined that he was over 60 years old. It was, therefore, proper for the court to remove him from the jury prior to the beginning of the introduction of the testimony. See *Doyal* v. *State,* 70 *Ga.* 142 (2); *Robinson* v. *State,* 109 *Ga.* 506 (34 S. E. 1017). Cf. *Albany Phosphate Co.* v. *Hugger,* 4 *Ga. App.* 771 (5), 780 (62 S. E. 533).

10. Grounds 7, 10, 11, 32, 43, 52, 65, 68 and 69 may be considered together, as they all present substantially the same point. They except to the fact that the court allowed witnesses to testify as to the declaration of dividends and as to the condition of the bank and as to other transactions relating to its affairs at dates other than December 31, 1906, the time when the alleged illegal

dividend in question was declared.    The testimony was relevant; especially in the light of the contention of the defendant that even though the declaration of the dividend was not justified by the conditions as they existed at the time, he thought that it was, and honestly believed that it was.    This testimony tended to show that the conditions which forbade the declaration of the dividend in question had been in existence or coming into force for so long a time that the defendant, by reason of his actual and presumptive knowledge of the bank's affairs, must have been cognizant of the conditions which did exist at the particular time in question. Further, the defendant was attempting to show, as one of the reasons why he did not know the condition on December 31, 1906, that the books were kept by subordinates, and that many of the transactions of the bank which led to its failure, as well as to its insolvency on the particular date in question, were not known to him; and much of the testimony objected to tended to show, either directly or circumstantially, that he did know, and participated in these transactions as to which he directly or indirectly professed ignorance.    To rebut this contention of the defendant, the evidence objected to had a direct relevancy.

11.   The thirteenth and fourteenth grounds of the motion present exceptions to the fact that the court allowed one of the directors of the bank to state that Mr. Cabaniss controlled the bank, and that the other directors joined in declaring the dividend, upon his statement that the affairs of the bank authorized the declaration of it.    The point counsel make is that the control of the bank was determined by its charter and by-laws, and that the written statement upon which the dividend was declared was prepared by the cashier of the bank.    It is plain, however, from all that the witness said upon the subject, that he was speaking of who actually controlled the bank, and not upon the subject as to where the control was located by the charter and by-laws, and as to what statements Mr. Cabaniss made in addition to the written statement that had been made by the cashier.    The charter and the by-laws of the bank would be the highest evidence as to who should have controlled the bank's affairs, but not as to who did in fact control and direct them.    Even if it were a violation of the charter and by-laws that the directors should have allowed one man to control absolutely the bank's affairs, yet it was competent to show by parol

testimony that the charter and by-laws were violated to the extent that the defendant did in fact control them—the word "control" being used in a concrete sense.

12. The twelfth ground makes complaint that the court allowed the solicitor-general to ask a witness for the State a leading question. The decisions holding that this is a matter solely within the discretion of the trial judge are too numerous and uniform to require citation.

13. Grounds 15, 20, 22, 31, and 47 present the point that the court allowed witnesses for the State to testify as to lists of notes, overdrafts, etc., giving names, also dates of maturity, on the ground that the notes themselves were the highest and best evidence of the transaction. These witnesses were not attempting to state the contents of the notes, further than to give the names and dates by which the particular papers could be identified. For instance, an expert accountant, in testifying as to the condition of the bank, would call off a list of the notes that had been charged off as being insolvent and worthless. This did not involve any going into the contents of the notes in such a way as to make it a violation of the rule which forbids parol evidence as to the contents of written documents. It is uniformly held that where notes and other writings are only collaterally involved, where their existence or identification rather than their substance is material, a witness may testify as to the papers, and may give, for the purpose of identification, such things as the names of the makers, the dates, amounts, etc. See Wigmore on Evidence, §§ 1242, 1244, 1253; *Central Railroad* v. *Wolff*, 74 *Ga.* 664 (2); *Henderson* v. *Central Railroad*, 73 *Ga.* 718 (2); *Sasser* v. *Sasser*, 73 *Ga.* 275 (5); *Kelly* v. *Kauffman Milling Co.*, 92 *Ga.* 105 (18 S. E. 363); *Fisher* v. *Jones Co.*, 93 *Ga.* 717 (21 S. E. 152); *Merchants National Bank* v. *Vandiver*, 104 *Ga.* 165 (30 S. E. 650).

We will later in the opinion touch upon the point that these witnesses in some cases were allowed to testify that these notes were classed as worthless or insolvent, though the witness himself had no personal knowledge or information as to their value or solvency.

14. The sixteenth ground presents the point that the court erred in permitting the expert accountant, Mr. Lukenbill, to testify as to what were the net earnings of the bank during certain periods, on the ground that the books themselves were the highest and best

evidence, and for the reason that the witness was testifying as to matters of which he had no independent knowledge. In the brief of the evidence there is an admission of counsel that the books themselves were introduced and showed the same facts that this witness had testified to. Even if it could be said that this testimony was inadmissible, the admission in the brief of the evidence prevented the plaintiff in error from complaining. Some of the other grounds, which we have classed above as presenting matters of harmless error only, fail for the same reason. However, the rule seems to be that where the documentory evidence consists of books of account containing multifarious details, expert accountants may summarize their contents and testify as to the result of the examination, provided the books themselves are made accessible to the court and the parties. See Wigmore on Evidence, § 1230.

15. In grounds 27, 28, 29, 33, and 41 complaint is made that the court erred in refusing to allow the State's witnesses, and especially the expert accountant, to testify on cross-examination as to their opinion as to how long it would take a person situated as the defendant was to have examined into the condition of the bank and to have ascertained its exact condition at the time of the alleged illegal· dividend, or at any period four years prior thereto; the stated object of the testimony being to show that it would have been physically impossible for the defendant (on account of the volume of the matter he would have had to examine) to have obtained an accurate knowledge of the bank's affairs within any reasonable length of time. As an abstract question of practice, we think that the court should have allowed these witnesses, especially the expert accountant, to express an opinion on this subject, and if the case were close and doubtful upon the salient· facts involved in this inquiry, we would probably grant a new trial for this error, but when it is remembered that the books themselves were before the jury and their volume was a matter of mere ocular inspection, it· is hardly conceivable that any juror of ordinary intelligence would have believed that the defendant or any other man could have been personally informed as to the details of all these transactions, or that he could have been cognizant in more than a general way of the ins and outs of all the bank's bookkeeping. We do not suppose that State's counsel or any one else ever insisted before the jury that the defendant personally

knew every transaction that occurred in the bank, or that it was physically possible for him to have known.   But as we have said in a previous portion of this opinion, it is also inconceivable that the defendant could have failed to know of the important fact that the bank was carrying as live assets such a large number of dead papers as to wipe out all margin of profits and to forbid the declaration of a dividend.   If we believed that the defendant was harmed or prejudiced before the jury by the exclusion of this testimony, we would give the error of the court a different effect, but in light of the whole case it would be a violation of the established rule forbidding new trials for harmless error to grant a reversal on this ground.

16.   The thirty-sixth and forty-eighth grounds illustrate each other and for that purpose will be considered together.   One witness was allowed to testify that he had made a memorandum of insolvent papers listed as live assets of the bank, after admitting his ignorance as to whether the papers were in fact insolvent or not; and another witness was allowed to testify that the papers listed as insolvent on the memorandum were in fact insolvent, without knowledge as to whether the memorandum was correct or not. In other words, one witness testified as to the memorandum and the other as to insolvency.   The testimony of either of the witnesses unsupported by the testimony of the other would probably have been objectionable, but so far as we know, it has never been considered objectionable that one witness might supplement and support the testimony of another witness.   Each testified as to the extent of his own knowledge, but the two taken together present a state of facts supported by the several credibility of the two witnesses.

17.   In the thirty-eighth ground exception is taken to the fact that the court allowed a witness to state that in his opinion the bank was insolvent at a designated time.   However, the witness had detailed to the jury the state of facts upon which he based his opinion.   The testimony was admissible under §5285 of the Civil Code.   Solvency or insolvency is a matter admitting of opinion evidence, under the general rules on that subject.   *Crawford* v. *Andrews*, 6 *Ga.* 244 (2) ; *Moore* v. *Dozier*, 128 *Ga.* 90 (4), 96 (57 S. E. 110).

18.   Coming to the fiftieth ground: The court admitted in evidence a letter addressed to the defendant by Mr. Orr, who had

been a former cashier of the bank, containing certain language which indicated that there had been between the two certain communications which would tend to discredit the defendant's contention in the present case as to his ignorance as to certain of the bank's transactions. This letter was admitted in connection with another letter, signed by the defendant's initials, and which from its internal contents seemed to relate to the same matters and to have been intended for Mr. Orr. The objection to this letter was that it was improperly obtained by the officers of· the court, and that, Mr. Orr having claimed the privilege of not testifying in the case, on the ground that his testimony would tend to criminate himself, the defendant was unable to cross-examine him upon the matter; and upon the further ground that it was not proved that Mr. Cabaniss had knowledge of the existence of this letter. This letter was found by the receivers of the bank in a drawer labelled with the defendant's initials, in which he kept both his private papers and papers relating to the bank. As against the objection that it had been improperly obtained, there is no doubt as to its admissibility. The circumstances connected with its being found —the place where it was kept and its being accompanied by the other letter, identified by the defendant's signature by initials— authorized the court to admit it to the jury; and it was for them to say whether the defendant had ever personally received it or not.

19. Grounds 56, 58, 59, 60, 61 and 62 relate to the admission · in evidence of the various books of the bank, the contention being that they were not properly proved. However, they were identified by different witnesses as being the bank's books and were brought into court by the receivers of the bank, under instructions from the court, at the request of defendant's counsel. The court did not err in admitting them. *Lowry National Bank* v. *Fickett,* 122 *Ga.* 490 (50 S. E. 396).

20. The fifty-seventh ground relates to a colloquy between court and counsel. As explained in the ground itself, the transaction affords no reason for reversing the judgment.

21. Grounds 63, 64 and 67 assign. error upon the court's admitting in evidence papers relating to certain transactions had with the bank under the name of C. M. Orr & Company; the chief objection to this testimony being that the defendant was not shown to have been connected with the transaction. However, there was

some evidence before the court from which the jury might have inferred that the defendant himself was a partner of this firm of C. M. Orr & Company. This being true, it was relevant for the State to go into the transaction.

22. The last ground of the motion assigns error upon the court's refusing to continue the case on account of the absence of a material witness, an expert accountant who, according to the showing, would have testified that the examination of the bank's books showed that the president and directors would have been justified from the books in declaring a dividend on the date alleged in the indictment. Taking together the combination of circumstances presented by this motion, we would be very hesitant to say that if we had been in the position of the trial judge we would not have given the defendant even additional time in which to get ready for trial, though the trial judge did grant him a number of extensions; yet, as a court of review, vested with no original discretion, we are unable to say as a legal proposition that the trial judge abused his discretion. Moreover, there is one matter which seems to control this exception. In the brief of the evidence, the plaintiff in error made the admission that the books introduced in evidence "fully corroborate the testimony of the witness as to the condition of the Exchange Bank of Macon at the different periods testified about by the several witnesses for the State; the said books also showed the correctness of all other facts testified about by various witnesses for the State as purporting to come from said books and as to information gathered from said books." It appears that counsel for the movant were allowed to insert this statement into the brief of the evidence in lieu of inserting into it an abstract of the books themselves. This was a hard alternative with which counsel were confronted,—either to incorporate into the brief of the evidence all the volume of writing necessary to abstract the wagon-load of books, or else admit by general statement that the books showed what the State's witnesses testified they showed. We are not prepared to say that counsel confronted with this proposition made an unwise choice. And yet we do not see how we can reverse a case because the court refused to allow the defendant time in which to get a witness to prove what he afterwards solemnly in judicio admitted not to exist, even though the admission in judicio was induced by circumstances almost amounting to duress. Our

law, especially our criminal law, is full of technical hardships, but they present propositions that must be dealt with as they are and not as they should be.

23.   Checking up to see if we have covered the points presented in this voluminous record, we find that we have overlooked one ground of the plea in abatement.   It was based on the reason "that L. B. Calhoun, after being impaneled and sworn as a [grand] juror to pass upon said special presentment, was improperly discharged, there being no legal cause for his discharge as grand juryman shown by the minutes of this court or known to the defendant."   We know no rule which requires the judge to record upon the minutes the grounds upon which he discharges a juror; and certainly it is no reason for quashing the indictment that the defendant did not know of any disqualification of the juror.   A very similar point was overruled by this court in *Parish* v. *State,* 6 *Ga. App.* 163 (64 S. E. 489).   The ground does not unequivocally allege, as it should, that the juror was not excused for any good and valid reason.   We doubt that this is a matter of which the defendant could complain, as eighteen men were left upon the grand jury at the time the indictment was returned, and this constitutes a full and legal grand jury in this State.   If Calhoun had been present and had voted against returning the presentment, it would not have affected the result.

24.   After a close, careful, painstaking review of the whole case, we have found no sufficient reason to reverse the judgment.

*Judgment affirmed.*

ON PETITION FOR REHEARING.

The rehearing is denied.   However, counsel insist that the judge, in sentencing the prisoner, treated the case as a felony involving moral turpitude.   We are not sure as to what view the judge held as to this.   If the offense is a felony, it does not involve moral turpitude.   It is purely statutory.   Under the national banking act, for instance, the things charged against the defendant would not constitute any crime at all.   There is so much doubt as to whether the acts charged constitute a felony, also whether a misdemeanor convict (not a female) can be sentenced to the State farm, that we have decided to grant the request of counsel that we give direction that the trial judge may, in his discretion, resentence the defendant at or before the time he makes the judgment of this

court the judgment of the superior court.   We are not sure that the trial judge needs the assistance of this court's direction in order that he may have the power to modify the sentence, but, to avoid any question as to this, we give the direction (as we have previously done in several similar cases) authorizing the judge to do so in his discretion.